## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| VISION METALS, INC., et al., | ) | Case No. 00-4205 (MFW) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| ———————————————— | ) | |
| | ) | |
| VISION METALS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. Proc. No. 02-6528 (MFW) |
| | ) | |
| SMS DEMAG, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| ———————————————— | ) | |

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S
## MOTION FOR JUDGMENT ON THE PLEADINGS AS TO
## COUNTS V AND VI OF THE COMPLAINT

Plaintiff, Vision Metals, Inc. ("Vision Metals"), by its undersigned counsel, files

this Memorandum of Law in opposition to the Motion for Judgment on the Pleadings as

to Counts V and VI of the Complaint, filed by Defendant, SMS Demag, Inc.

("Defendant" or "Demag").

### I. INTRODUCTION

In Counts V and VI of its Complaint[1] Vision Metals seeks the entry of an order

(1) vacating an order entered by this Court authorizing the assumption of a contract

between Vision Metals and the Defendant and (2) declaring that such order does not bar

---

[1]      Filed herewith is Vision Metal's Amended Complaint and Motion for Leave to Amend. The
Amended Complaint, with more factual detail, asserts the same claims as alleged in the original Complaint.
The statements of fact in this Memorandum will be supported with citations to the original and amended
Complaints.

Vision Metals from pursuing the avoidance actions alleged in Counts I-IV of the
Complaint. In seeking judgment as a matter of law on the pleadings as to Counts V and
VI, Defendant relies on legal sound byte quotations and omits and/or glosses pertinent
facts alleged in Vision Metals' Complaint. Close scrutiny of the cases quoted by
Defendant reveals that such cases have no application to the circumstance of an assumed
contract relating to the purchase of a $16.5 million mill that was singularly central to the
buyer's economic success and, ultimately, its ability to reorganize in bankruptcy, and
where

- from the inception of the parties' dealings, it was misrepresented by the
  manufacturer that the mill would be able to manufacture tubes meeting "even
  boiler tube quality standards;" and

- the buyer relied upon the representation that the mill would manufacture tubes
  meeting "boiler tube quality standards" in determining whether to (1) go forward
  with the original sales agreement, (2) go forward with a separate settlement
  contract and (3) assume that latter contract in bankruptcy; and

- the mill failed ever to produce the product it was designed to manufacture; and

- the manufacturer coerced the buyer with threats that it would withdraw technical
  support and assistance if the buyer did not agree in a settlement agreement,
  essentially to waive significant rights and remedies available to the buyer under
  its original contract with the manufacturer, and then later to assume that
  settlement agreement in bankruptcy; and

- the settlement agreement was entered into by the buyer because it perceived that
  the settlement agreement was its only means of avoiding being stuck with a $16.5
  million white elephant mill and avoid having wasted additional millions of
  additional dollars that were spent in capital improvements to its facilities to house
  the mill; and

- the buyer, for similar reasons, assumed that same settlement agreement in the
  bankruptcy case; and

- the buyer's ability to successfully reorganize hinged entirely on the
  manufacturer's ability to fulfill its promise that the mill would work as
  represented and satisfy a provision in the assumed contract requiring that the
  manufacturer "show that the . . . Mill is able to process the small diameter/light

2

wall tube with the dimension 0.840" x 0.109" (Outer Diameter x Wall Thickness)," which obligation the manufacturer did not meet; and

- the buyer, when it assumed the settlement agreement, was seeking to reorganize in bankruptcy; and

- the failure of the buyer to successfully reorganize is directly attributable to the manufacturer's failure to perform under the assumed contract; and

In this adversary proceeding, Vision Metals seeks the entry of an order vacating the Court's earlier order allowing the Debtor to assume the contract that is the subject of this proceeding. Such relief may be accorded Vision Metals by the Court invoking its inherent, "ancient and elementary power" to revise its own orders. Rules 60 and 54 of the Federal Rules of Civil Procedure and § 105(a) of the Bankruptcy Code also authorize this Court to grant the relief sought herein by Vision Metals. In addition, principles of equitable estoppel bar Defendant from asserting herein that Vision Metals may not pursue avoidance actions under Counts I-IV of the Complaint as a result of the so-called settlement agreement entered into by the parties.

## II.    STATEMENT OF FACTS

### Gulf States Tube

Vision Metals is a Debtor-In-Possession in the above-captioned bankruptcy cases (the "Bankruptcy Cases"). See Complaint, ¶ 1; Amended Complaint, ¶ 1. From its inception, Vision Metals (and its predecessor, Quanex Corporation ("Quanex")) manufactured tubing and pipe[2] at its Gulf States Tube plant in Rosenberg, Texas, through

---

[2]    Tubing is characterized by tighter tolerances, i.e., the dimensions of the product are more accurate/precise. Pipe is designated by its outer diameter and a nominal inner diameter (approximate specifications).

the use of a hot mill and a cold mill.[3] See Complaint, ¶ 1; Amended Complaint, ¶¶ 1, 12. Because the Gulf States Tube stretch reducing mill was outdated, Vision Metals determined to replace the old mill and to expand its product lines to manufacture hot-finished mechanical tube and hot finished boiler quality tube. Amended Complaint, ¶ 12. Vision Metals sought to manufacture these products because they could be sold at a higher margin and, thus, more profitably than the tubing products then manufactured by Vision Metals. Id.

SMS Demag, Inc. is a Pennsylvania corporation engaged in the business of designing, selling, maintaining and supervising the installation of mills for producing pipes, tubes and related metal products. See Complaint, ¶¶ 2, 12; Amended Complaint, ¶¶ 1, 13, 14. Demag was advised of Vision Metals' goals and recommended to Vision Metals that Vision Metals could realize its goals with the purchase of an assel mill (the "Assel Mill") designed and manufactured by Demag. See Amended Complaint, ¶ 14. Prior to its purchase of the Assel Mill, Vision Metals' managers had received a brochure which, in pertinent part, proclaimed that the Assel Mill was capable of manufacturing tubing that would "meet even boiler quality standards." Id. At all relevant times, Demag represented to Vision Metals that the walls of the tube manufactured by the Assel Mill would be uniform throughout. Id. Such claims were reiterated by agents and employees of Demag in numerous conversations with the Debtor's employees. Id.

---

[3]    In a cold mill, hot finished tubes are drawn through a series of reducing dies and over a mandrel using lubricant. Heat is applied only to "stress relieve" tubing that has become brittle from the processes. The cold mill process produces tube with more precise tolerances, but is extremely labor-intensive and brings with it higher environmental risks. Thus, tubing manufactured through the cold mill process is more expensive to produce and can be sold at a more narrow profit margin.

In the tubing industry, it is widely known and understood that tubing which meets "boiler quality standards," among other things, is characterized as having thin walls and a smooth interior surface. See Amended Complaint, ¶ 15. Tubing that meets these standards is used in boilers and other high-pressure applications and must have high concentricity (uniform wall thickness). Id. If the tubing is too eccentric (or lacking in uniformity of wall thickness), the boiler can burst as a result of the rapid heat transfer. Id. For the same reason, the smoothness of the inner surface of the tube is vital. Id. The Debtor's employees, therefore, understood Demag's representations to mean that the Assel Mill was capable of procuring thin-walled, hot-finished boiler tube with a smooth interior surface and uniform wall thickness. Id.

Demag further represented to Vision Metals that the Assel Mill permitted further processing in the downstream reducing and stretch-reducing mills without the need for intermediate reheating. See Amended Complaint, ¶ 16. This capability would eliminate the investment and operating costs of an additional furnace and would enable the production line into which the Assel Mill was to be incorporated to operate more economically. Id.

In reliance upon Demag's representations, Vision Metals determined to purchase the Assel Mill from Demag. See Complaint, ¶ 12; Amended Complaint, ¶ 17. The parties entered into an Agreement for Supply of Equipment for an Assel and Stretch Reducing Mill Project (the "Original Agreement"). Id. Indeed, but for the fact that it was represented by Demag that the Assel Mill was capable of manufacturing tubing that would "meet even boiler quality standards," Vision Metals would not have entered into the Original Agreement. See Amended Complaint, ¶ 17.

Pursuant to the Original Agreement, Vision Metals was to pay Demag $16,542,000 in installments between October 1997 and March 1999 pursuant to a payment schedule. See Complaint, ¶ 12; Amended Complaint, ¶ 18. In exchange, Demag was to design, supply, deliver and install an assel mill capable of meeting certain specified performance guarantees (the "Performance Guarantees") which, if met, would allow for the production of boiler quality tubing. Id. The parties anticipated that the Assel Mill would be fully operational by July 1999. See Amended Complaint, ¶ 18.

In connection with its purchase from Demag of the Assel Mill, Vision Metals was required to expand its building and undertake substantial capital improvements to its facilities to house the Assel Mill. See Amended Complaint, ¶ 19. These improvements cost over $1,000,000.00. Id.

Installation of the Assel Mill began in January 1999, yet due to a series of mechanical and electrical problems associated with the installation of the Assel Mill which were not resolved until Spring 2000, Vision Metals was not able to attempt the manufacture of boiler quality tube until the Summer of 2000. See Amended Complaint, ¶ 20.

In the Summer of 2000, when efforts were first undertaken to manufacture boiler quality tubes, it became immediately apparent that the Assel Mill was not able to manufacture boiler quality tube, as Demag had represented. See Complaint, ¶ 15; Amended Complaint, ¶ 21. The inner surface of the tubes produced by the Assel Mill had a sandpaper-like quality and the concentricity of the tube did not achieve the percentages guaranteed. See Amended Complaint, ¶ 21. In short, the tube produced by

the Assel Mill failed to meet the Performance Guarantees. See Complaint, ¶ 15;

Amended Complaint, ¶ 21.

## Failure Of The Assel Mill Leads To The First Settlement Agreement

During the Summer and Fall of 2000, Vision Metals sought technical support

from Demag with regard to the poor-quality tube produced by the Assel Mill. See

Complaint, ¶16; Amended Complaint, ¶ 22. Notwithstanding that the Performance

Guarantees had not been met, Demag refused to provide support to remedy the problem

unless Vision Metals agreed to (1) enter into an agreement limiting Vision Metals' rights

and remedies under the Original Agreement and (2) provide Demag with a "Certificate of

Final Acceptance."[4] See Complaint, ¶17; Amended Complaint, ¶ 22. At the same time,

Damag's agents and employees continued to represent to Vision Metals that the Assel

Mill could be made capable of manufacturing tubing that would meet boiler quality

standards. Id.

As of late Summer and Fall of 2000, Vision Metals was in financial distress. See

Amended Complaint, ¶ 23. It had expended approximately $16 million for the Assel Mill

and millions more for capital improvements and had realized nothing for an investment

that was to have made Vision Metals more profitable. Id.

Because Demag was the only party who could conceivably make the Assel Mill

fully and properly operational, and in reliance upon continuing misrepresentations by

Demag that it could, in fact, fix the problems with the Assel Mill, Vision Metals signed a

---

[4]     Section I, at page 2, of the Original Agreement, required Vision Metals issue to Demag a "Certificate of Final Acceptance" upon the earlier of 6 months after final delivery of the Assel Mill or the date that the Assel Mill met the Performance Guarantees. Defendant, in its Motion, asserts that the Certificate of Final Acceptance executed in connection with the First Settlement Agreement signified that the contract Performance Guarantees had been met. Defendant's Memorandum, at 3. In making this assertion, Defendant ignores that the issuance of the Certificate just as easily could have signified that 6 months had passed since final delivery of the Assel Mill.

settlement agreement (the "First Settlement Agreement") on August 17, 2000 under duress. See Complaint, ¶17; Amended Complaint, ¶ 24. Pursuant to the First Settlement Agreement, Demag, among other things, waived payment of the final $864,300.00 payment due from Vision Metals for the Assel Mill and agreed to provide continued assistance and support to Vision Metals in order to bring the Assel Mill in compliance with the Performance Guarantees and, thus, capable of manufacturing tubing that would meet boiler quality standards. Id.

More specifically, the First Settlement Agreement provided as follows:

    a.    The last installment payment due from Vision Metals to Demag would not be paid, "to compensate the extra costs occurred on [the Debtor's] side and caused by Demag during the erection and commissioning of the Assel and Stretch reducing Mill Project,"

    b.    Demag agreed to send "adequate personnel" to Gulf States Tube to assist in the operation of the Assel Mill;

    c.    Vision Metals would pay for spare parts in four equal monthly installments from August 2000 through December 2000;

    d.    Demag would provide Vision Metals with the technical support necessary to make the Assel Mill meet the Performance Guarantees;

    e.    Demag was required to demonstrate that the Assel Mill could "process the small diameter/light wall tube with the dimensions 0.840" x 0/109" (Outer Diameter x Wall Thickness)," i.e., boiler quality standard;[5]

    f.    "[Demag's] liability for faults resulting from the execution of the present [First] Settlement Agreement is restricted to the extent that [Demag] will undertake to rectify the said faults or re-execute the supervision of erection and commissioning. Damage to the Work will be made good by [Demag] by repair or replacement at [Demag's] discretion, provided that the equipment involved is part of [Demag's] scope of supply. [Demag's] liability as defined above is restricted to US $25,000 per single occurrence, but maximum to US $50,000 per all occurrences in aggregate;"

---

[5]    Notably, Defendant ignores this provision of the First Settlement Agreement relating to the performance of the Assel Mill.

g. "Notwithstanding any other provision of this [First] Settlement Agreement, in no event, whether as a result of breach of contract, tort (including negligence), or otherwise, shall [Demag] be liable to [the Debtor] for any type of indirect or consequential damages whatsoever suffered by [the Debtor] such as, but not limited to, anticipated profits, loss of contracts, reduction in use of any facilities or the increased expense of operations, or otherwise;"

h. "Both Parties declare that with exception of the claims and/or obligations listed under the present Claim Settlement Agreement no further claims and/or obligations shall exist between [the Debtor] and [Demag]."

See Complaint, ¶ 19; Amended Complaint, ¶ 25.

At the time the parties entered into the First Settlement Agreement, Demag knew or should have known that the Assel Mill could not and would not ever produce tubing that would achieve boiler quality standards. See Amended Complaint, ¶ 26.

## Continued Failure Of The Assel Mill Necessitates Assumption Of The First Settlement Agreement

Burdened by debt and having spent over $16 million in connection with a non-functioning Assel Mill, Vision Metals filed for bankruptcy on November 13, 2000. See Complaint, ¶ 11; Amended Complaint, ¶ 27. As of that date, the Assel Mill continued to fail to meet the Performance Guarantees, was incapable of producing tubing that would achieve a boiler quality standard and Vision Metals continued to require technical support from Demag for the Assel Mill. See Amended Complaint, ¶ 27. As of the Petition Date, the Assel Mill was so critical to the success of Vision Metals that, without Demag's continued support, Vision Metals would be forced to cease operations, and Vision Metals' efforts to reorganize would fail. See Complaint, ¶ 21; Amended Complaint, ¶ 27.

Because of Demag's misrepresentations regarding its ability to repair the Assel Mill, it was thought possible that the Debtor could, in fact, reorganize. Thus, Vision Metals determined early in the bankruptcy case that it should attempt to reorganize, rather than liquidate. Indeed, the success or failure of Vision Metals' reorganization would rise

or fall with the ability of Demag to make true its representation that the Assel Mill could manufacture boiler quality tube. See Amended Complaint, ¶ 27.

Despite its knowledge that the Assel Mill could not and would not ever be able to produce boiler quality tube, Demag insisted that Vision Metals assume the First Settlement Agreement pursuant to § 365 of the Bankruptcy Code and threatened to withdraw all technical support if Vision Metals refused to comply. See Complaint, ¶ 22; Amended Complaint, ¶ 28.

In reliance upon Demag's continued representations that it could make the Assel Mill capable of producing boiler quality tube, on January 17, 2001, the Debtor filed a motion with this Court seeking authority to assume the First Settlement Agreement pursuant to § 365 of the Bankruptcy Code (the "Assumption Motion"). See Complaint, ¶ 23; Amended Complaint, ¶ 29. By the Assumption Motion, the Debtor sought, among other things, authority to pay Demag equal payments of $25,846 from January 2001 through April 2001 and an additional $16,023 for certain spare parts support.[6] Id.

---

[6]     Defendant, in its Motion does not seek judgment with respect to the preference, post-petition transfer and fraudulent conveyance claims asserted in the Complaint. Defendant nonetheless asserts that Vision Metals' assumption of the First Settlement Agreement "bars all claims asserted by Vision in this case." Defendant's Memorandum, at 5 n.3. Defendant's suggestion is unfounded.
    When the First Settlement Agreement was entered into in August 2000, the preference, post-petition transfer and fraudulent conveyance claims were not then claims which existed in favor of Vision Metals. Only when it filed for bankruptcy several months later, November 2000, did such claims arise under 11 U.S.C. §§ 544(b), 547 and 548. Under Texas law (which governed the Original Agreement), in order for a claim to be released, "the releasing instrument must 'mention' the claim to be released. Even if the claims exist when the release is executed, any claims not clearly within the subject matter of the release are not discharged." Victoria Bank & Trust Co. v. Brady, 811 S.W.2d 931, 938 (Tex. 1991). The First Settlement Agreement therefore, did not operate as release of the fraudulent conveyance claims asserted herein because (1) such claims did not exist at the time the agreement was entered into and (2) any terms of release in that agreement did not identify any existing or future fraudulent conveyance claims as being released. Vision Metals' subsequent assumption of the First Settlement Agreement did not endow Defendant with any greater rights than it received a the time the agreement was entered into. E.g., In re Jackson, 105 B.R. 418, 419 (Bankr. S.D. Ohio 1989).
    The fact that the subject transfers were made pursuant to a contract does not mean that they cannot be set aside as avoidable transfers under applicable law. The other elements of a fraudulent conveyance, insolvency at the time or as a result of the transfers, inadequate capital or inability to pay debts are alleged in the Complaint as are the elements of a preference under § 547 of the Bankruptcy Code and unauthorized post-petition transfers under § 549.

On January 31, 2001, without objection, the Court entered an order granting the Assumption Motion and authorizing the Debtor to assume the First Settlement Agreement pursuant to § 365 of the Bankruptcy Code (the "Assumption Order"). See Complaint, ¶ 24; Amended Complaint, ¶ 30. In pertinent party, the Assumption Order provides: "The Court retains jurisdiction over the Debtors, SMS Demag, and all parties asserting an interest in the [First Settlement] Agreement in order to implement and effectuate the provisions of this Order."

**Persistent Failure Of The Assel Mill Leads To The Second Settlement Agreement**

Following the assumption of the First Settlement Agreement, the Assel Mill still failed to meet the Performance Guarantees, and its obligations under the First Settlement Agreement, including, among other things, the failure to "process the small diameter/light wall tube with the dimensions 0.840" x 0.109" (Outer Diameter x Wall Thickness)," as set forth in paragraph (e). See Complaint, ¶ 25; Amended Complaint, ¶ 31. The Assel Mill had yet to produce boiler quality tube. Id.

Demag threatened to withhold technical support unless Vision Metals agreed to enter into a second settlement agreement which would further limit its rights and remedies against Demag. See Complaint, ¶ 26; Amended Complaint, ¶ 32. Because it still hoped to reorganize, and still believing that Demag – and only Demag - was capable of remedying the defective Assel Mill, the Debtor entered into a Minutes of Meeting and Agreement with Demag on March 7, 2001 (the "Second Settlement Agreement"). Among other things, the Second Settlement Agreement required that Demag resume the provision of the services specified in the First Settlement Agreement and further extend the warranty period granted pursuant to the First Settlement Agreement. Id. In

exchange, the Debtor released, or otherwise limited its damages for, claims it had against Demag (the "Second Settlement Transfers"). Id.

The Assel Mill never satisfied the Performance Guarantees and, of course, never produced boiler quality tube. See Amended Complaint, ¶ 33. Because it did not work, the mill was shut down in September 2002. Id.

The Court did not authorize the Debtor to enter into the Second Settlement Agreement. See Complaint, ¶ 27; Amended Complaint, ¶ 34.

## III.    STANDARD OF REVIEW

"'In evaluating a Rule 12(c) motion, the court must view the pleadings in the light most favorable to, and draw all inferences in favor of, the nonmoving party.'" Revis v. Slocomb Indus., Inc., 765 F. Supp. 1212, 1213 (D. Del. 1991) (quoting Madonna v. United States, 878 F.2d 62, 65 (2d Cir. 1989)). The court may grant the motion "only if no relief could be granted under any set of facts that could be proved." Turbe v. Government of the Virgin Islands, 938 F.2d 427, 428 (3d Cir. 1991) (citation omitted). "Since Rule 12(c) provides for the summary disposition of a party's claims on the merits before discovery, such motions are disfavored." Southmark Prime Plus, L.P. v. Falzone, 776 F. Supp. 888, 891 (D. Del. 1991) (citing Cardio-Med. Assoc., Ltd. v. Crozer-Chester Med. Ctr., 536 F. Supp. 1065, 1072 (E.D. Pa. 1982)). If a complaint "contains even the most basic of allegations that, when read with great liberality, could justify plaintiff's claim[s] for relief, motions for judgment on the pleadings should be denied." Cardio-Med., 536 F. Supp. at 1072 (E.D. Pa. 1982); accord Southmark, 776 F. Supp. at 891.

## IV. VISIONS METALS HAS PROPERLY AND SUFFICIENTLY ASSERTED A CLAIM UNDER COUNT V TO VACATE AND/OR REVISE THE ASSUMPTION ORDER

### A. This Court may vacate the Assumption Order by invoking its inherent authority to review and revise its own orders.

Quoting from a decision penned by Judge Learned Hand, the Seventh Circuit, in In re Lintz West Side Lumber, Inc., 655 F.2d 786 (7th Cir. 1981), observed that as courts of equity, bankruptcy courts possess an "'ancient and elementary power to reconsider'" their own orders. 655 F.2d at 789 (quoting In re Pottasch Bros. Inc., 79 F.2d 613, 616 (2d Cir. 1935)). The Seventh Circuit further observed that "[i]t is now well settled that a bankruptcy judge has the power to reexamine and revise an order which he entered during the pendency of bankruptcy proceedings." Id.

This inherent power of the bankruptcy courts has also been recognized by the Third Circuit and bankruptcy courts within the Third Circuit. See, e.g., Brielle Assocs. v. Graziano, 685 F.2d 109, 111-12 (3d Cir. 1982) (holding that a bankruptcy court has jurisdiction to reconsider its own order disallowing creditor's claim); In re H.K. Porter Co., Inc., 156 B.R. 149, 150 (Bankr. W.D. Pa. 1993) (reinstating creditors' claims, which claims have previously been dismissed following creditors' failure to respond to debtor's objections to such claims); American Bank & Trust Co. v. Lebanon Steel Foundry (In re Lebanon Steel Foundry), 48 B.R. 520, 523-24 (Bankr. M.D. Pa. 1985) (granting motion to amend liquidation order that had been entered into as a consent agreement between a debtor and secured lenders, where the debtor sought permission to resume its operations – and, thus, not liquidate – based on changed circumstances).

Lintz involved an appeal from an order granting a bankruptcy trustee's motion to set aside an earlier order authorizing the debtor to abandon certain assets. The trustee

moved to set aside an order authorizing the abandonment of assets because the trustee's investigation revealed that the abandoned property was distributed to a creditor whose security interest was shown to have been unperfected. See 655 F.2d at 791.

Recognizing the "'ancient and elementary power'" of the bankruptcy court to reexamine and revise orders entered during the pendency of bankruptcy proceedings, the Seventh Circuit noted that abandonment normally divests the trustee of title to the abandoned property, and precludes the trustee from claiming the benefit of any subsequent unforeseen enhancement in the value of the abandoned property. Id. at 789. The bankruptcy court's order revising the abandonment order was affirmed by the Seventh Circuit because the trustee had not sought to reclaim appreciated property or unfairly prejudice an innocent party who had come into possession of abandoned property. Id. at 790-91. In so ruling, the Seventh Circuit observed:

> There is no indication in the Rules of Bankruptcy Procedure that abandonment orders should be treated differently from other orders of a bankruptcy judge which are subject to reexamination. . . . The absence of an explicit ban on reconsideration of abandonment orders in the Bankruptcy Rules and the availability of alternate relief [under Rule 60 of the Federal Rules of Civil Procedure] tend to indicate that abandonment orders remain subject to the "ancient and elementary power [of the bankruptcy judge] to reconsider" his own orders. Pottasch Bros., 79 F.2d at 616.

655 F.2d at 791 (second set of brackets in original); see also Killebrew v. Brewer (In re Killebrew), 101 B.R. 471, 473-74 (Bankr. S.D. Miss. 1988), aff'd, 888 F.2d 1516 (5th Cir. 1989) (granting motion to revoke abandonment of property, when abandonment was based on the debtor's false representation that no equity existed in the property).

Similarly, there is no indication in the Bankruptcy Rules that assumption orders should be treated differently than other orders by a bankruptcy judge which are subject to reexamination. The absence of an explicit ban on reconsideration of such orders in the

Bankruptcy Rules and, as will be discussed below, the availability of alternate relief under Rules 60 and 54 of the Federal Rules of Civil Procedure, plainly indicates that assumption orders are subject to the "ancient and elementary power" of this Court to reexamine and revise its own orders. See also In re Superior Toy & Mfg. Co., Inc., 78 F.3d 1169, 1175-76 (7th Cir. 1996) (citing Lintz and suggesting that, on motion, an assumption order procured by false representation may properly be set aside); cf. In re UAL Corp., 299 B.R. 509, 522 (Bankr. N.D. Ill. 2003) (invoking the inherent authority of a bankruptcy judge to reexamine and revise prior orders in granting debtors' motion to vacate earlier order providing for assumption of aircraft financing agreements).

As described above, it is alleged in this adversary proceeding that Demag, at all relevant times, misrepresented the capabilities of the Assel Mill and the ability of its personnel to make the Assel Mill produce tubes meeting "even boiler quality standards." When it entered into the First Settlement Agreement, Vision Metals was financially distressed having spent millions of dollars on the Assel Mill and capital improvements to its facilities, and having realized nothing on its investment. Vision Metals' management perceived that a properly operational assel mill was critical to the company's ability to become profitable and, further, viewed Demag as the only party capable of making the Assel Mill work. Demag leveraged this position to exact the First Settlement Agreement from Vision Metals.

The circumstances were little changed several months later when Vision Metals, having now filed for bankruptcy and seeking to reorganize, was left with little choice than to cede to Demag's demands that the First Settlement Agreement be assumed.

The circumstances have now changed.

Demag has never fulfilled its obligation to demonstrate that the Assel Mill could produce boiler quality tubing, the mill is shut down and the Debtor has no reasonable prospect of reorganizing. The Debtor's difficulty in reorganizing relates directly to Demag's failure to meet its contractual obligations, by selling the Debtor a mill that has never properly functioned and by failing even to meet an obligation it undertook in the First Settlement Agreement to demonstrate that the Assel Mill could produce "small diameter/light wall tube. . . ." These facts, which must be assumed as true for purposes of instant Motion by Defendant, lead inextricably to the conclusion that equitable relief from the Assumption Order is appropriate.

**B.    The Assumption Order may be vacated under Rule 60(b) of the Federal Rules of Civil Procedure**

In pertinent part, Rule 60(b) of the Federal Rules of Civil Procedure provides:

> On motion and upon such terms as are just, the court may relieve a party . . . from a final judgment, order, or proceeding for the following reasons: . . . (5) . . . it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment.

F. R. Civ. P. 60.[7] Rule 60(b)(6) may be applied to relieve a party of an order based on changed circumstances. See, e.g., Lebanon Steel, supra, 48 B.R. at 524-27; C.I.T. Corp. v. Johnson & Morgan Contractors (In re Johnson & Morgan Contractors), 29 B.R. 372 (Bankr. M.D. Pa. 1983); Commonwealth of Pa. State Employees' Retirement Fund v. Durkalec (In re Durkalec), 21 B.R. 618 (Bankr. E.D. Pa. 1982); see also Kirwan v. Vanderwerf (In re Kirwan), 164 F.3d 1175 (8th Cir. 1999) (applying Rule 60(b) and

---

[7]    Rule 60 is made applicable to bankruptcy proceedings by Bankruptcy Rule 9024. The relief provided by Rule 60(b) may be secured in an independent action, which is how Vision Metals has proceeded in this case.

general equitable principles to grant creditors relief from earlier order denying creditors' proofs of claim); Lintz, supra, 655 F.2d at 791 (citing Rule 60 as additional authority for setting aside earlier abandonment order).

In Lebanon Steel, the debtor entered into a stipulated order with two of its creditors, which stipulation resolved complaints filed by the creditors to lift the automatic stay and the debtor's application to use cash collateral. Pursuant to the stipulated order, the debtor was to cease taking new orders, was permitted to finish work-in-process and was to prepare and implement a liquidation program of all of its assets. See 48 B.R. at 521. Thereafter, the debtor moved to revise the stipulated order because it believed that it could profitably resume its operations. Like Demag,[8] the creditors in Lebanon Steel argued that the stipulated order could not be modified absent exceptional circumstances and cited cases in support of arguments that the parties' interest in finality and the principle of not relieving a party of its "free, calculated and deliberate choice," precluded the court from revising the stipulated order. Id. at 522-23 (citing Ackerman v. United States, 340 U.S. 193 (1950)).

With respect to the inherent power of a court of equity to "vacate or otherwise modify its own decrees," the court in Lebanon Steel stated that "modification is particularly appropriate where factual circumstances have changed." Id. at 523. This inherent power, the court continued, "is particularly great in those cases where [the court] has assumed responsibility for supervising the continued conduct of the parties in the face of changed conditions." Id. The court, quoting from Justice Cardozo, rejected the argument "'that a decree entered upon consent is to be treated as a contract and not as a

---

[8] See Defendant's Memorandum, at 7.

judicial act. . . . [I]n truth what was then adjudged was not a contract as to any one. The consent is to be read as directed toward events as they then were. It was not an abandonment of the right to exact revision in the future, if revision should become necessary in adaptation to events to be.'" Id. (quoting United States v. Swift & Co., 286 U.S. 106, 114-15 (1932)) (ellipses and brackets in Lebanon Steel).

In assessing the propriety of a party's request for relief under Rule 60, the court observed that the "unique nature of [a] bankruptcy proceeding" requires that a bankruptcy court "liberally exercise its power [under Rule 60(b)(6)] to vacate or modify a judgment when necessary to 'accomplish justice.'" Id. at 524. In this regard,

> "[t]he only criteria necessary is to 'accomplish justice.' Specifically, 'Rule 60(b)(6) should be liberally applied to accomplish justice and when a cause is properly in clause (6), the Court has broad legal discretion to grant or deny relief in light of the relevant circumstances. . . ." In re Ireco Industries, Inc., 2 B.R. 76, 84 (Bankr. D. Or. 1979). In short, Rule 60(b)(6) is a reservoir of equitable power to do justice in particular cases where relief is warranted."

Id. (quoting In re Durkalec, 21 B.R. at 619-20 (ellipses in Lebanon Steel)). The court concluded its exhaustive analysis of Rule 60(b)(6) by noting that the liberal application of the Rule "'is particularly necessary and important when reviewing orders issued in a Chapter 11 case which require continuing conduct of the Debtor In Possession and on which the success or failure of the rehabilitation might depend.'" Id. (quoting In re Johnson & Morgan, 29 B.R. at 374).

Finding that strict adherence to the prior order for liquidation would work an undue hardship on the debtor and was unnecessary to protect the creditors' interests, and that the circumstances had changed such that the debtor could profitably operate its

business, the debtor's motion for relief from the stipulated order was granted. <u>See</u> <u>id</u>. at 524-27.[9]

Similarly, in <u>Johnson & Morgan Contractors</u>, the debtor and a creditor stipulated to the entry of an order, <u>inter alia</u>, requiring that the debtor make certain payments to retain equipment necessary for its coal mining operations and, upon a default by the debtor, allowing the creditor to repossess the equipment without further order of court. <u>See</u> 29 B.R. 372-73. Thereafter, changed economic circumstances resulted in a lower demand for coal sold by the debtor and, therefore, its ability to make payments required by the stipulated order. <u>Id</u>. at 373-74. When the debtor defaulted and the creditor sought to exercise its remedies under the stipulated order, the debtor filed a motion for relief from the provisions of the stipulated order allowing the creditor to repossess the equipment.

As in <u>Lebanon Steel</u>, the court in <u>Johnson & Morgan</u> paid little heed to arguments that Rule 60(b)(6) should be applied only in cases of "'extraordinary circumstances' or 'extreme hardship.'" <u>Id</u>. at 374. Rather, the court exercised its liberal power to accomplish justice when presented with changed circumstances, and granted the debtor's motion for relief from the stipulated order. <u>See</u> <u>id</u>. at 374-75; <u>accord</u> <u>In re Durkalec</u>, 21 B.R. at 619-20 (in light of changed circumstances, granting debtors' motion for relief from an earlier order lifting the automatic stay to allow creditor to foreclose on debtors' home).

---

9        In <u>Lebanon Steel</u>, the court also relied on Rule 60(b)(5) as additional authority for granting relief. In that regard, the court noted that "[i]t has been held that a change in factual or legal circumstances may make continued enforcement of an order inequitable within the meaning of Rule 60(b)(5)." 48 B.R. at 523.

The Assumption Order specifically provided that this Court would retain "jurisdiction over the Debtors, SMS Demag, and all parties asserting an interest in the [First Settlement] Agreement to implement and effectuate the provisions of this Order." In connection with the Assumption Order, the Court presumably retained jurisdiction over the parties because the Assel Mill was a matter "'on which the success or failure of [Vision Metals'] rehabilitation might depend.'" The changed circumstances here, as alleged in the Complaint, like the changed circumstances in Lebanon Steel,[10] Johnson & Morgan, and Durkalec, dictate that Vision Metals be granted relief from the Assumption Order under Rule 60(b)(5) and (b)(6).[11]

---

[10]     The circumstances here are a mirror image of the circumstances in Lebanon Steel. In Lebanon Steel, the debtors sought relief from an order that was entered into at a time when the debtor believed that it was unable to reorganize. Circumstances changed, such that the debtor sought relief from the order which required that it liquidate its assets. Here, the Assumption Order was assumed at a time when Vision Metals thought that it could reorganize. Largely because of Demag's conduct and its failure to deliver an assel mill that would produce boiler quality tube, the Debtor has no hope of reorganizing.

[11]     The cases cited by the Defendant in its argument that Rule 60 cannot be applied to the facts alleged in this case are inapposite. First, the circumstances in many of the cases cited by Defendant have nothing to do with bankruptcy or a bankruptcy court order in which the court retains continuing jurisdiction over the matter which is the subject of the order. See Ackerman v. United States, 340 U.S. 193 (1950) (affirming denial of motion under Rule 60 to overturn decision canceling status of movants as naturalized citizens); McCormick v. Chicago, 230 F.3d 319 (7th Cir. 2000) (affirming denial of motion to reinstate claims against certain defendants in a civil rights action); Yapp v. Excel Corp., 186 F.3d 1222 (10th Cir. 1999) (affirming denial of motion under Rule 60 to set aside stipulation of dismissal with prejudice in employment matter); Andrulonis v. United States, 26 F.3d 1224 (2d Cir. 1994) (affirming denial of Rule 60 motion seeking relief from agreement settling action brought under the Federal Tort Claims Act, where the movant, in hindsight, believed it had overpaid in settlement of the case); Nemaizer v. Baker, 793 F.2d 58 (2nd Cir. 1986) (reversing trial court's order granting relief under Rule 60, relieving movant from dismissal with prejudice in state law action); Martinez-McBean v. Virgin Islands, 562 F.2d 908 (3rd Cir. 1977) (reversing trial court's order granting motion under Rule 60, relieving movant from dismissal of employment action); Ryan v. Asbestos Workers Union Local 42 Pension Fund, 2000 WL 1239958 (D. Del. Aug. 25, 2000) (denying Rule 60 motion in ERISA action, where motion raised new arguments that could previously have been raised based on facts known to the movant) (this case was submitted by Defendant as Exhibit C to Defendant's Appendix). Also, the quote from Yapp, at page 7 of Defendant's Memorandum, pertains to a motion under Rule 60(b)(1), relating to excusable litigation mistakes or mistakes of law or fact by a judge in issuing a final judgment, and not to a motion under Rule 60(b)(6). See 186 F.3d at 1231.
    The bankruptcy or bankruptcy-related decisions cited by Defendant also have no bearing on this matter. In In re Zimmerman, 869 F.2d 1126 (8th Cir. 1989), the Eighth Circuit affirmed an order of the Bankruptcy Court denying the motion of a creditor under Rule 60(b)(6) to revoke a debtor's discharge and dismiss the debtor's bankruptcy petition on the grounds of bad faith. In that case, the creditor, without explanation, did not earlier move for such relief and, although the circumstances were the same throughout the debtor's bankruptcy case, never took any earlier steps to protect her own interests. See 869 F.2d at

In light of the Defendant's misrepresentations throughout concerning the capabilities of the Assel Mill and Demag's ability to make the mill work, this is not a case involving previously known facts, but rather one involving changed circumstances sufficient to grant relief under Rule 60. Although every case involving fraudulent conveyances necessarily involves "hindsight assessments," the allegations here of persistent misrepresentations, undue influence, duress and changed circumstances cannot so easily be boiled-down or ignored. At a minimum, such facts alleged with respect to an Order over which this Court has continuing jurisdiction must be fully developed for the record at a trial on the merits.

### C. The Assumption Order may be revised and vacated pursuant to § 105(a) of the Bankruptcy Code.

Section 105(a) vests the Bankruptcy Court with the authority to "issue any order, process, or judgment that is necessary and appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). While § 105(a) cannot be used to rewrite the Bankruptcy Code or create substantive rights under the Code, that principle has no application to a motion under a rule of procedure, or otherwise, to vacate a prior order of the Bankruptcy Court. Thus, the purpose of § 105(a) is to give the court the power to protect its custody of the estate and the administration thereof. In re Int'l Institute of the Americas, Inc., 63 B.R. 294, 298-99 (D. P.R. 1986).

---

1128. Thus, Zimmerman was not an instance of a court reexamining an order based on changed circumstances.

In In re Parker, 90 B.R. 857 (Bankr. W.D. Mich. 1988), the debtors moved to vacate an order granting a creditor a replacement lien on the debtor's crops, which were planted with the creditor's cash collateral. The motion to vacate was based on an assertion that the creditor had no security interest in the cash collateral. In large measure, the debtor's motion to vacate was denied because they had been aware of their claim that the creditor had no security interest, but failed to raise it at an earlier hearing in order to expedite their ability to use the disputed cash. See 90 B.R. at 861. The court, in any event, also ruled that the debtors' argument regarding the creditor's security interest was not meritorious. Id. at 862.

The original assumption motion was brought under § 365 of the Bankruptcy Code,[12] which permits the Debtor to assume or reject unexpired executory contracts. If the court vacates the Assumption Order, the effect will be to restore to the parties the status quo ante at the time of the Assumption Motion. See Fayette Bank v. Nesser (In re Nesser), 206 B.R. 357, 369 (Bankr. W.D. Pa. 1997)(holding that the court's use of its equitable powers under section 105(a) was appropriate to restore the status quo ante, to re-open a Chapter 7 case, and vacate an order authorizing abandonment of stock). This would permit the Debtor to reject the unexpired executory contract, a right which was available to the Debtor under § 365, which right may very well have been acted on but for Demag's inequitable conduct. Consequently, no substantive rights in addition to what is allowed by the Bankruptcy Code would accrue to the Debtors.

For purposes of the instant Motion, the Court must construe the Complaint in a light most favorable to and draw all inferences in favor of Vision Metals as the non-moving party. Revis v. Slocomb Indus., Inc., supra, 765 F. Supp. at 1213. When read with the great liberality required under law for deciding motions for judgment on the pleadings, the Complaint contains sufficient allegations that justify Vision Metal's claims for relief; therefore, the instant Motion should be denied.

---

[12]    Section 365(a) provides:
        Except as provided in sections 765 and 766 of this title and in subsections (b), (c), and (d) of this
        section, the trustee, subject to the court's approval, may assume or reject any executory contract or
        unexpired lease of the debtor.
11 U.S.C. § 365(a).

### D. The Court may also revise its prior Order under Rule 54 of the Federal Rules of Civil Procedure

In the event the Court were to consider the order approving the assumption of the first settlement agreement as an interlocutory order and not a final order in the case, Rule 54(b) rather than Rule 60(b) would be applicable. Rule 54(b) provides:

> . . . any order or other form of decision, however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties.

F. R. Civ. P. 54. Thus, Rule 54(b) provides a procedural vehicle for the court to revise any non-final order.

In the instant case, the Assumption Order was not a contested matter. Rather, it was a routine administrative order and could be considered interlocutory since the assumption of a contract cannot be said to be completely final until a plan of reorganization is confirmed. Therefore should the Court determine that the Assumption Order is interlocutory, the same reasons that support vacating the order under Rule 60(b), mandate vacating the order under Rule 54(b).

### V. COUNT VI OF THE COMPLAINT PROPERLY ASSERTS A CLAIM FOR EQUITABLE ESTOPPEL

Defendant's contention that the pleadings present no basis for the application of equitable estoppel is fundamentally flawed. It argues that because Vision Metals assumed the Final Settlement Agreement, it is bound by the statements in those documents. That assumes, _arguendo_, that the Assumption Order cannot be vacated. Thus, its argument is circular and self-serving.

Defendant also fails to provide the Court with all the facts regarding the Certificate of Final Acceptance that was issued in connection with the First Settlement Agreement. As noted above, the issuance of the Certificate of Final Acceptance did not necessarily mean that the Performance Guarantees in the Original Agreement had been met. Defendant glosses over the fact that the Original Agreement required that the Certificate be issued upon the earlier of 6 months from final delivery of the Assel Mill or when the Performance Guarantees had been met. Defendant's bald assertion that the issuance of the Certificate meant that the Performance Guarantees had been met is, at best, one of two inferences that can be drawn from the issuance of the Certificate. At this stage, all inferences must be drawn in favor or Vision Metals.

Based on the facts alleged, Defendant should be estopped from asserting that the Assumption Order somehow bars Plaintiff's preference, post-petition transfer and fraudulent conveyance claims because Demag induced Vision Metals to enter into and assume the First Settlement Agreement by false representations, with undue influence and by taking advantage of Vision Metals' utter dependence upon Demag.

In order for a party to prevail on an equitable estoppel argument, it must show that (1) a misrepresentation of fact was made, (2) which it reasonably relied upon and (3) that resulted in an injury to it. Pickett v. In re Integrated Health Servs., Inc. (In re Integrated Health Servs., Inc.), 2004 WL 60639 (Bankr. D. Del. Jan. 9, 2004);[13] see also Rosen v. Hotel & Restaurant Employees Union, 637 F.2d 592, 597 (3rd Cir. 1981) (creditor estopped from asserting claim against debtor in bankruptcy where creditor had induced the trustee to believe that it had abandoned its claim against the debtor). As stated above,

_____

[13]     A copy of the Pickett decision is attached hereto as **Exhibit A.**

Defendant represented to Vision Metals that it could repair and make the Assel Mill work, i.e., that the mill would produce boiler quality tube. Vision Metals reasonably relied on that representation, and was induced by that representation to enter into the First Settlement Agreement and assume the First Settlement Agreement. Vision Metals had a right to rely on Defendant's representations and did rely on them, both when it agreed to the First Settlement Agreement and when it assumed that agreement. Vision Metal's reliance on that representation caused it injury because the Assel Mill did not work, it could not be made to work and, as a result, Vision Metals was forced into liquidation.

While the burden of proof is on the party asserting estoppel, Integrated Health, 2004 WL 60639, at * 5, for purposes of the instant motion, all that the Plaintiff need do is assert sufficient allegations that could justify Vision Metals' claims for relief. Vision Metals has properly alleged such facts as would permit its equitable estoppel claim to go forward.

## VI. CONCLUSION

For the reasons set forth herein, Plaintiff, Vision Metals, Inc., requests that this Court issue an Order denying Defendant's Motion for Judgment on the Pleadings as to Counts V and VI of the Complaint.

Dated: January 16, 2003

Respectfully submitted,

Neil B. Glassman (No. 2087)
Steven M. Yoder (No. 3885)
Ashley B. Stitzer (No. 3891)
THE BAYARD FIRM
222 Delaware Avenue, Suite 900
Wilmington, Delaware 19899
(302) 655-5000

-and-

Kenneth Oestreicher
Howard R. Feldman
Kristin P. Herber
Whiteford, Taylor & Preston
Seven Saint Paul Street
Baltimore, Maryland 21202
(410) 347-8700

Counsel for Debtors and
Debtors in Possession

*1534927*